(167 App. Div. 286)

PEOPLE ex rel. DRY DOCK, E. B. & B. R. CO. et al. v. PUBLIC SERVICE COMMISSION FOR FIRST DIST. et al. (No. 7081.)

(Supreme Court, Appellate Division, First Department. May 7, 1915.)

STREET RAILROADS ⬥52—REFUNDING MORTGAGE—APPLICATION TO · PUBLIC SERVICE COMMISSION—AUTHORITY OF COMMISSION.

    Under Public Service Commission Law (Consol. Laws, c. 48) § 55, providing that a street railroad may issue bonds, or other evidence of debt, when necessary for the discharge or lawful refunding of its obligations, provided that there shall have been secured from the commission an order authorizing such issue and stating the purposes for which the proceeds shall be applied, that in the opinion of the commission the money or property to be procured or paid for is or has been reasonably required for the purposes specified in the order, and that, except as otherwise permitted in the order, such purposes are not, in whole or in part, reasonably chargeable to operating expenses or to income, and providing for a hearing and determination thereof, the Public Service Commission, on application of an insolvent street railroad to issue refunding mortgage bonds to refund receiver's certificates authorized by the federal courts, certificates of indebtedness issued by the company, an adjudicated claim against it in favor of another street railroad for moneys expended for its permanent betterment, and miscellaneous claims against it acquired by such other street railroad, was authorized to consider whether the proposed issue was reasonably required for the refunding purpose; whether the expenditure to be refunded was a capital, as distinct from an operating or income, charge; and, if the expenditure to be refunded was an operating or income charge, whether such refunding should be permitted under the exception of the statute reading "except as otherwise permitted * * * in the case of bonds," and might withhold its approval until it appeared that the securities sought to be refunded represented actual investments for the company's capital account; but it could not apply the test of the actual value of the company's property and its earning capacity as the ground for its approval.

    [Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 130, 131; Dec. Dig. ⬥52.]

Ingraham, P. J., and Scott, J., dissenting.

Application by the Dry Dock, East Broadway & Battery Railroad Company and Ralph J. Jacobs and others, as Protective Committee, etc., to the Public Service Commission for the First District, etc., and Edward E. McCall and others, as Commissioners, for an order authorizing the issuance of refunding bonds. From an order denying the application, the People, on relation of applicant, bring certiorari. Writ dismissed, and proceedings of the commission affirmed.

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Argued before INGRAHAM, P. J., and CLARKE, SCOTT, DOWLING, and HOTCHKISS, JJ.

Morgan J. O'Brien, of New York City (Herbert J. Bickford, Nathan Ottinger, and Henry M. Ward, all of New York City, on the brief), for relators.

George S. Coleman and Oliver C. Semple, both of New York City, for respondents.

DOWLING J. The Dry Dock, East Broadway & Battery Railroad (hereinafter referred to as the "railroad") is a domestic corporation organized in 1866, and operating three routes in the city of New York, one of which is equipped with an underground electric system, and the other two with electric storage battery cars. It had been operated for some years as a constituent part of the Third Avenue Railway system, which owned substantially all the capital stock, aggregating $1,200,000. In February, 1908, in an action brought in the United States Circuit Court, Southern District of New York, by the American Hay Company, a general creditor, based on the insolvency of the railroad company, for the marshaling of its assets and their distribution among the creditors in the order of priority of claims, a receiver was appointed for the railroad, who has since been operating it in that capacity. On February 15, 1908, the railroad company was adjudged insolvent and the receivership was continued, pending the final determination of the action. A special master was appointed to pass upon all the claims against the railroad, and he has reported thereupon; his report having been confirmed by the court prior to the initiation of this proceeding. All preferred claims against the railroad have been paid, and substantially all claims not entitled to a preference have been acquired, by the Third Avenue Railway Company. Pending the receivership, by orders of the United States Circuit Court and the United States District Court, Southern District of New York, dated April 22, 1911, and July 18, 1913, respectively, the receiver was authorized to issue receiver's certificates, under the first order to the extent of $350,000, for the purchase of not more than 50 electric storage battery cars, and for the alterations in tracks, barns, and other property that might be necessary for the operation of said cars; and by the second order to the extent of $149,000, to be issued to the Third Avenue Railway Company in payment of the indebtedness of the receiver to said company for sums expended by it on said work and not represented by certificates issued pursuant to the original order. On July 31, 1913, the railroad company presented to the Public Service Commission for the First District its petition setting forth that an agreement had been made between it, the Third Avenue Railway Company, and a protective committee of the holders of certain certificates of indebtedness (representing $1,050,000 of said certificates out of a total of $1,100,000) for the refunding of all the company's debts and obligations by the issue of refunding mortgage gold bonds to be dated July 1, 1913, and payable January 1, 1960, to be secured by a refunding mortgage and deed of trust to the Central Trust Company of New York, as trustee. The

bonds to be secured by the mortgage were to consist of three classes, as follows:

Series A, not exceeding $1,500,000. Of these $950,000 were to be used to refund the outstanding general mortgage 5 per cent. gold bonds of a similar amount, and the balance for the acquisition of new property or for the improvement or betterment of existing property.

Series B, to the amount of $560,000, to be issued to the Third Avenue Railway Company in exchange for the receiver's certificates issued under the orders of April 22, 1911, and July, 1913, amounting to $499,-000, with the accrued interest thereon, and for certain other claims.

Series C to the amount of $2,240,000, whereof bonds to the aggregate of $1,140,000 were to be issued to the Third Avenue Railway Company, which was to accept them (with the foregoing series B bonds amounting to $520,000, or a total in new securities of $1,660,000) in payment of all claims held by it against the railroad amounting to $2,102,912.97. The remaining series C bonds amounting to $1,100,000 were to be issued to the holders of the 5 per cent. certificates of indebtedness in satisfaction of their claims, which amounted to $1,100,000, with accrued interest thereon aggregating $325,416.67.

The relator asked that the commission give its consent to the issue by it of its refunding mortgage and deed of trust to the Central Trust Company of New York as trustee, and to the issue thereunder by the petitioner of $560,000 series B bonds and $2,240,000 series C bonds, to refund its debts and obligations in the matter aforesaid. At the time of the filing of this petition, the debts of the petitioner were as follows:

| | | |
|---|---:|---:|
| 1. Mortgage to the Farmers' Loan & Trust Company, as trustee, being a first lien on all of petitioner's property............................$ 950,000 00 | | |
| 2. Receiver's certificates issued under the order of the court dated April 22, 1911...............$ 350,000 00 | | |
| Accrued interest to June 30, 1913, thereon...... 27,330 35 | | |
| Receiver's certificates issued under the order of the court dated July, 1913................. 149,000 00 | | |
| | | 526,330 35 |
| 3. Five per cent. certificates of indebtedness issued by petitioner in the year 1892.............. 1,100,000 00 | | |
| Accrued interest from August 1, 1907, to June 30, 1913................................... 325,416 67 | | |
| | | 1,425,416 67 |
| 4. Claim of Third Avenue Railroad based on promissory note dated April 30, 1907, for $1,822,-963.70. This note having been proved before the special master, the railroad company voluntarily reduced its claim to $1,500,000, at which sum it was approved by the master.................. 1,500,000 00 | | |
| 5. Claims on contract and tort allowed by the special master........................................ 58,513 60 | | |
| 6. Claims for money expended by the Third Avenue Railway Co. in the acquisition or settlement of claims against the petitioner........................ 30,000 00 | | |
| Total ...............................................$4,490,260 62 | | |

The petitioner introduced no evidence as to the value of its property, but the commission's engineer fixed it at $2,470,306. After hearings

had been held, the commission, by a majority vote declined to approve the pending application, and in its opinion Commissioner Maltbie, summarizing his conclusions, said that:

"The applicants asked to be allowed to readjust their indebtedness (practically to reorganize) without proof that the new or old debts represented property of equal value or cost. They have not proved that the obligations to be refunded were for capital purposes, that no obligations were incurred to pay for replacements, or that all withdrawals had properly been credited to capital account. They disregard these points and hold that the commission ought not even to investigate and ascertain the facts. They practically declare that the existence of a real obligation gives them the right to capitalize it, regardless of its character or the purpose for which it was incurred. They argue that it is immaterial and that it does not concern the commission whether the company will earn interest on the proposed issue of bonds or not."

He further said that:

In his opinion it was not "only the power but the duty of the commission before approving the proposed issue of bonds: (1) To ascertain the purposes for which the funds obtained from the obligations to be refunded were used. (2) To determine whether all represented permanent improvements of the plant, or renewals and replacements of obsolete or worn-out property. (3) To ascertain whether all withdrawn, replaced, and abandoned property has been credited to capital account at the figure at which it was entered in that account. (4) To segregate all expenditures for maintenance, renewals, and replacements and the cost of all withdrawals, and to permit the capitalization of only such expenditures as represent permanent improvements to the net amount. (5) To restrict the amount of bonds to a figure upon which the company will with reasonable certainty earn interest."

In his dissenting opinion Commissioner Williams held, interpreting section 55 of the Public Service Commission Act:

"First. That in all issues of new securities after the enactment of this law, the Public Service Commission must be satisfied that the securities sought to be issued are for the legitimate capital purposes set forth in the act. Second. That, as to lawful obligations entered into before the passage of the act, the commission should have no jurisdiction except when it became necessary to refund such obligation, and then only to determine whether the new issue sought is necessary for that purpose."

To so hold, he was obliged to, and did, interpret the legislative purpose, which concededly was intended to prevent overcapitalization by public service corporations, not only as inoperative to warrant interference with obligations already issued, but also as inoperative to prevent the refunding of these same obligations when they became due, except to ascertain if the refunding was lawful and the amount necessary for that purpose. The relator having petitioned for a rehearing, which was granted, the commission after taking further proof unanimously reaffirmed its former decision and finally denied the application.

The relator stands upon the same interpretation of the law as that of Commissioner Williams, and contends that inasmuch as the obligations sought to be refunded are concededly valid obligations, and as the paramount of such refunding issue is to be less than the total of the securities to be retired, and as the interest on the new obligations is to be less than that on the old, its petition should have been granted, and the issue of the refunding securities allowed, without calling upon it to make proof either of the application of the funds realized or repre-

sented by the old securities, the value of the relator's property, its earning capacity, or any other proof of a like nature. In other words, it contends that, where a public service corporation has valid outstanding obligations issued before the Public Service Commission law took effect, it is entitled as a matter of course to obtain the consent of the Public Service Commission to issue new securities to refund them. The section of the Public Service Commission Law (chapter 480, Laws of 1910; Consol. Laws, c. 48), so far as it is material to the present inquiry, is as follows:

"Sec. 55. A common carrier, railroad corporation or street railroad corporation organized or existing, or hereafter incorporated, under or by virtue of the laws of the state of New York, may issue stocks, bonds, notes or other evidence of indebtedness payable at periods of more than twelve months after the date thereof, when necessary for the acquisition of property, the construction, completion, extension or improvement of its facilities, or for the improvement or maintenance of its service or for the discharge or lawful refunding of its obligations or for the reimbursement of moneys actually expended from income * * * within five years next prior to the filing of an application with the proper commission for the required authorization, for any of the aforesaid purposes except maintenance of service and except replacements, * * * provided and not otherwise that there shall have been secured from the proper commission an order authorizing such issue, and the amount thereof and stating the purposes to which the issue or proceeds thereof are to be applied, and that, in the opinion of the commission, the money, property or labor to be procured or paid for by the issue of such stock, bonds, notes or other evidence of indebtedness is or has been reasonably required for the purposes specified in the order, and that except as otherwise permitted in the order in the case of bonds, notes and other evidence of indebtedness, such purposes are not in whole or in part, reasonably chargeable to operating expenses or to income; but this provision shall not apply to any lawful issue of stock, to the lawful execution and delivery of any mortgage or to the lawful issue of bonds thereunder, which shall have been duly approved by the board of railroad commissioners before the time when this act becomes a law. * * * For the purpose of enabling it to determine whether it should issue such an order, the commission shall make such inquiry or investigation hold such hearings and examine such witnesses, books, papers, documents or contracts as it may deem of importance in enabling it to reach a determination. Such corporation shall not without the consent of the commission apply said issue or any proceeds thereof to any purpose not specified in such order. Such common carrier, railroad corporation or street railroad corporation may issue notes, for proper corporate purposes and not in violation of any provision of this chapter or any other act, payable at periods of not more than twelve months without such consent, but no such notes shall, in whole or in part, directly or indirectly, be refunded, by any issue of stock or bonds or by any evidence of indebtedness running for more than twelve months without the consent of the proper commission. * * * *"

It seems clear that the Legislature deemed the new scheme of corporate regulation applicable to every act had thereunder, whether the security, property, or debts upon which it operated was already in existence, or its existence was contemplated to the extent of having been authorized by prior proper authority, though not yet actually in being. Otherwise, there would have been no need of providing that stocks, mortgages, and bonds theretofore approved by the board of railroad commissioners should be beyond the control of the new commission.

In People ex rel. Third Avenue Railway v. Public Service Commission, 145 App. Div. 318, 130 N. Y. Supp. 97, this court held that the statutory provisions of the reorganization of railroads, embodied in

sections 9 to 12 of the Stock Corporation Law (Consol. Laws, c. 59), had not been repealed by implication by the provisions of the Public Service Commissions Law; that the reorganization statute was complete in itself to the extent of its direct provisions; that new corporations formed in conformity therewith were given the express power to issue the stock and bonds provided for in their adopted plan of reorganization; that the Public Service Commissions Law is additional and supplementary to the Stock Corporation Law, as it is additional and supplementary to the Railroad Law (Consol. Laws, c. 49); that an application was entirely proper to the commission; and that the commission was vested with the power to determine whether the proposed stocks and bonds were issued under and in conformity with the provisions of the statute for the purposes mentioned therein for the discharge of the actual and not the fictitious debts of the company, for the refunding of its actual obligations, and whether the new corporation had been duly organized and become vested with the title to the property and franchises of the old corporation, but that it was not vested with power to pass upon the plan of reorganization. It was the contention of the Public Service Commission in that case that it had the power "to determine the details of the reorganization scheme and the amount of stocks and bonds which may be issued in order to carry it out; that the wishes, views, and interests of the purchasers, the bondholders, and the stockholders, crystallized in their plan, and on the faith of which the purchase was made and confirmed by the court, were absolutely of no effect whatever; that it has the power to regulate these details." The order of this court was affirmed in 203 N. Y. 299, 96 N. E. 1011, and Chief Judge Cullen, writing for a unanimous court, held that the provisions of the Stock Corporation Law, and those of the Public Service Commissions Law, were not inconsistent; that the enactment of the latter law did not repeal the provisions of the former law for the reorganization of the property and franchises of corporations sold under foreclosure; and, on the other hand, that the provisions of the Stock Corporation Law did not withdraw corporations formed on reorganizations from compliance with section 55 of the Public Service Commissions Law. But the court held that the commission was not justified in refusing its consent to the reorganization plan applied for, because the value of the mortgaged property and the amount of the new capital to be invested were less than the amount of new securities to be issued by the corporation.

"The requirement of the Stock Corporation Law is that the plan or agreement adopted by the parties in interest shall not be inconsistent with the laws of the state, but there is no provision in the Public Service Commissions Law that the securities issued shall in no instance exceed the value of the property. Indeed, it contains no express provision to that effect at all, although doubtless it was intended by the law to prevent the issue of fictitious or 'watered' securities, and the Stock Corporation Law (section 55) forbids the issue of stock or bonds except for money or labor or property at their respective values." 203 N. Y. 309, 96 N. E. 1014.

"It is not necessary to consider the issuance of the securities of the new corporation as a refunding of the outstanding obligations of the old. It is sufficient to say that the statute authorizes the bondholders, stockholders, and creditors to agree upon a plan for the readjustment of their respective interests, and authorizes the new corporation to issue its stocks and bonds in ac-

cordance with the agreement. A readjustment of the interests of the parties does not contemplate that the new securities shall necessarily be scaled down to the actual value of the property. If this was the contemplation of the statute, the statute would be of little value. The property sold rarely realizes the amount due on the mortgage foreclosed. If the sale price is considered the criterion of value, there could be no plan which could give the holders of stock or of junior securities any interest in the new corporation, while often the bondholders under the mortgage foreclosed might find themselves without the right to obtain any securities of the new corporation in lieu of their bonds. The intent of the statute was to enable the various persons interested in an insolvent or defaulted railroad to agree upon some plan or scheme to take the road out of insolvency and a receivership and make the enterprise a going concern. For this purpose additional money is generally requisite, which, as already said, can be obtained only from those interested in the property, and not even from them unless, as an inducement to advance the money, they are given the opportunity of retrieving their prior investment. In many instances the growth of the community in which the railroad was located and the improvement in business conditions has ultimately justified the advance of new capital, and the benefit and protection of the original investors in the enterprise was also the object of the statute. We do not say that in the reorganization of a railroad the new corporation is authorized to issue securities in excess of those of the company in whose property and franchises it has succeeded and the new money that may be put in the enterprise. Such a plan would be plainly inconsistent with the spirit of the Public Service Commissions Law against the issue of 'watered' stock or bonds; but, up to the limit we have named, the new corporation has the right to issue securities." 203 N. Y. 311, 96 N. E. 1014.

After the final determination in the Third Avenue Case (which was rendered in April, 1911), the Legislature added a new section (55a) to the Public Service Commissions Law (chapter 289, Laws 1912, in effect April 12, 1912), and evidently intended to meet the decision of the courts, section 2 whereof provided that:

Upon "all such reorganizations the amount of capitalization, including therein all stocks and bonds and other evidence of indebtedness, shall be such as is authorized by the commission which, in making its determination, shall not exceed the fair value of the property involved, taking into consideration its original cost of construction, duplication cost, present condition, earning power at reasonable rates and all other relevant matters and any additional sum or sums as shall be actually paid in cash."

This new section, however, applied solely to the reorganization of railroads, and did not affect, in any way, the state of the law so far as it referred to the refunding of obligations by a road not proposed to be reorganized, and it was limited in its effect to sections 9 and 10 of the Stock Corporation Law, which refer exclusively to reorganizations upon sale of corporate property and franchises, whether under a mortgage or deed of trust, or pursuant to a judgment or decree of a court of competent jurisdiction, or by virtue of any execution issued thereunder. It did not apply by its terms to the other possible means of disposing of its property, (1) by merger, or (2) by voluntary sale. Nor did the provisions of section 55a apply to the refunding of the existing obligations of a corporation which it was not proposed to reorganize in anticipation of a sale, or thereafter. The reasoning of the Court of Appeals in the Third Avenue Case, in determining that the statute did not make the actual value of the property of the corporation the basis for the issuance of securities under a reorganization plan, it seems to

me, is equally applicable to the issuance of refunding securities, and the value of the mortgaged property can have no bearing upon the amount of new securities to be issued under the refunding plan.

Applying the reasoning of the Court of Appeals to the question at bar, which is unaffected in any way by the subsequent amendment by the Legislature referred to, it would seem that, unless there is some special language in the provision of the statute relating to refunding which differentiates it from the provision for reorganization, the functions of the commission do not include a determination of the value of the corporate property as a basis for the amount of new securities to be issued in refund. Examining the statute again, we find a clause providing for "the discharge of lawful refunding of its lawful obligations," inserted amidst other purposes for which the company may issue its stock, bonds, or other evidence of indebtedness payable more than a year after date, without any differentiation in manner of treatment from the other class of corporate purposes therein inserted. The proviso is that there shall have been secured from the commission an order authorizing the issue, with the amount thereof, and stating the purposes for which the proceeds thereof are to be applied. Then follows the requirement:

"And that in the opinion of the commission the money, property or labor to be procured or paid for by issue of such stock, bonds, notes or other evidence of indebtedness is or has been reasonably required for the purposes specified in the order."

And the final provision:

"And that except as otherwise permitted in the order in the case of bonds, notes, and other evidence of indebtedness, such purposes are not, in whole or in part, reasonably chargeable to operating expenses or to income."

The real question before us is whether the last proviso is applicable to the facts in this case and vests the commission with the power or duty of inquiry into the application made of the funds represented by the securities sought to be refunded and of determining that such funds were actually applied to capital account and of limiting their approval of new securities to those required to refund obligations representing actual accretions to the capital account. The securities sought to be refunded may be divided, generally speaking, into: (1) Receiver's certificates authorized by the federal courts during the incumbency of the receiver, who is still in possession of the company's property, and which have accrued since April 22, 1911. (2) Certificates of indebtedness issued by the company in 1884 to the amount of $1,200,000 bearing interest at the rate of 6 per cent. per annum, refunded in 1892 by the payment of $100,000, reducing the total to $1,100,000, and by the reduction of the interest charge to 5 per cent. (3) Claim held by the Third Avenue Railroad Company and adjudicated by the federal court at $1,500,000, arising out of a promissory note for $1,822,963.70 made on April 30, 1907, by the railroad to the trustee under the mortgage to the old Third Avenue Railroad Company and representing amounts advanced and expended during a period of years by the Metropolitan Street Railway Company, the New York City Railway Company, and the old Third Avenue Railway Company, as claimed for

permanent betterment and improvement of the property of the Dry Dock, East Broadway & Battery Railroad Company, chiefly in the erection of a car barn at Fourteenth street and Avenue B, the electrification of the Grand Street Crosstown Line, and the electrification of two of the three routes owned by the Dry Dock Company. (Objections were filed to the allowance of this claim before the special master in the federal court, raising the issue as to whether the expenditures for which the note was given were chargeable to capital or operating account, and the special master finally determined, after an examination of the original vouchers, that an aggregate of about $1,600,000 of the account was properly chargeable to capital account, and by consent the claim was liquidated at $1,500,000, which sum had been actually expended in permanent betterments and improvements for the Dry Dock Company, and was properly chargeable to its capital account.) (4) Miscellaneous claims acquired by the Third Avenue Railroad Company, amounting to $115,642.97.

The original Public Service Commissions Law took effect July 1, 1907 (chapter 429, Laws of 1907). It contained a provision allowing the issuance of securities payable in more than a year, among other purposes, for the discharge of lawful refunding of the corporate obligations, "provided and not otherwise, that there shall have been secured from the proper commission an order authorizing such issue, and the amount thereof and stating that in the opinion of the commission the use of the capital to be secured by the issue of such stock, bonds, notes or other evidence of indebtedness is reasonably required for the said purposes of the corporation, but this provision shall not apply to any lawful issue of stock, to the lawful execution and delivery of any mortgage or to the lawful issue of bonds thereunder, which shall have been duly approved by the board of railroad commissioners before the time when this act becomes a law."

In People ex rel. Delaware & Hudson Company v. Stevens et al., 197 N. Y. 1, 90 N. E. 60, the court said:

"We understand that the paramount purpose of the enactment of the Public Service Commissions Law was the protection and enforcement of the rights of the public. Public service corporations have been granted valuable franchises to enable them to serve the public, and they are deemed to have undertaken to render to the public the service for which they were incorporated upon receiving a proper and reasonable compensation therefor. It is the duty of railroad corporations not only to maintain their equipment, tracks, and roadbed in good order, but also to operate their railroads with safety to the public and afford such service as will supply the reasonable demands of the public. For a generation or more the public has been frequently imposed upon by the issue of stocks and bonds of public service corporations for improper purposes, without actual consideration therefor, by company officers seeking to enrich themselves at the expense of innocent and confiding investors. One of the legislative purposes in the enactment of this statute was to correct this evil by enabling the commission to prevent the issue of such stock and bonds, if upon an investigation of the facts it is found that they were not for the purposes of the corporation enumerated by the statute and reasonably required therefor. We do not think the legislation alluded to was designed to make the commissioners the financial managers of the corporation, or that it empowered them to substitute their judgment for that of the board of directors or stockholders of the corporation as to the wisdom of a transaction, but that it was designed to make the commissioners the

guardians of the public by enabling them to prevent the issue of stock and bonds for other than statutory purposes; these purposes we have already enumerated in quoting the statute, the last being for the discharge or lawful refunding of its obligations.

"In regard to the notes issued for the purpose of acquiring the stock and securities of the Hudson Valley Railway Company, there is no question made with reference to the amount or their validity. Commissioner Decker, in delivering the prevailing opinion, says with reference to these notes that they 'are lawful obligations, resting upon the corporation, and, no matter how the proceeds were expended, the debts must be paid. The general credit of the company is pledged in these note issues, and that verdict is based upon its income not only from the railroad but from its coal operations and its other properties including securities of other companies. These notes are being carried necessarily on short terms, one year or less, and the interest charges are comparatively high. It is important that they should be discharged by actual payment or evidences of debt running for a period of more than one year. The obligations were contracted in the exercise of a legal right by the corporation, and the proceeds were devoted to the purchase of securities at a time when the corporation was entitled to acquire the stock of other railroad corporations and street railroad corporations without asking permission to do so from any board or tribunal. This commission is without power to require the corporation to divest itself of title to these or any securities or property, and the law now in force specifically declares that its provisions shall not be construed to prevent the holding of stock heretofore lawfully acquired. In that respect only do note obligations, created prior to the Public Service Commissions Law, to raise funds with which to acquire property, including railroad securities, differ in character from the treatment they must receive from such obligations issued after the law became effective. Under that statute a railroad corporation or street railroad corporation may not purchase or take over the stock of another such corporation without first obtaining the consent of this commission. We must therefore treat the acquirement of these traction securities as a thing accomplished and for the purpose of this case as a lawful act.'

"The learned commissioner, however, reaches the conclusion that, notwithstanding the fact that the transaction was lawful, and that the notes were the valid obligations of the corporation, the purchase of the Hudson Valley securities was an unfortunate one for the company, that it paid for the securities more than they were worth and that the property so acquired has not been included in the mortgage. They consequently withheld their consent to the issuing of the bonds, but suggested that a mortgage might be executed by the United Traction Company, the present owner of the Hudson Valley Railway Company, upon the property acquired from that company for the retirement of such obligations. This, we think, would be substituting the judgment and discretion of the commissioners for that of the directors and stockholders of the corporation. If such was the purpose and intent of the statute, a doubt might arise with reference to its constitutionality. For, ordinarily, the ownership of property carries with it the right of occupancy and management, and, should a statute deprive the owner of the right to manage, it would, under ordinary circumstances, undermine his right to protect and make his property remunerative. Lord v. Equitable Life Assur. Soc., 194 N. Y. 212, 87 N. E. 443, 22 L. R. A. (N. S.) 420.

"As we have seen, the stockholders have voted in favor of issuing the mortgage for the security of the bonds which are here sought to be issued. The commission has given its consent that such mortgage should be executed, and the directors, in accordance therewith, have executed a mortgage upon which upwards of $13,000,000 in bonds have already been issued. It appears from the finding of the commissioners, as stated in their opinion, that the Hudson Valley Railroad Company's properties are of uncertain value, and that the purchase of the stock and securities of the company by the relator was unwise and should not have been made. Assuming that the purchase was unfortunate and that the company has lost heavily thereby, still the commis-

sioners conceded that it was made at a time when no consent of the railroad commissioners or of the Public Service Commission was required, and that therefore the purchase was legal, and one which the company had a right to make. But, if the property so acquired is of uncertain value and the road is unable to pay running expenses, it might well be good judgment on the part of the Delaware & Hudson Company not to attempt to relieve itself from the burden of paying the notes by an attempt to issue mortgage bonds based upon the security which that property affords.

"The notes which the company had issued, as we have seen, bear interest at a high rate. They were given for the acquisition of property, which is one of the four purposes designated by the statute for which bonds may be authorized to issue. Having been given for the acquiring of the property of another railroad, they are properly classified as capital, and are therefore brought within the express provisions of the statute under which the application was made. While, as we have stated, the ownership of property ordinarily carries with it the right of management, the duty devolves upon the owner to so manage as not to have it become a nuisance or necessarily infringe upon the rights of others. It was therefore evidently the legislative intent in the enactment of this provision that the commissioners should have supervision over the issuing of long-time bonds to the extent of determining whether they were issued under and in conformity with the provision of the statute for the purposes * * * therein, or whether they were issued for the discharge of the actual and not the fictitious debts of the company, or whether they were issued for the refunding of its actual obligations and not for the inflation of its stocks or bonds. Beyond this it appears to us that the power of the commissioners does not extend, unless it may pertain to the power to determine whether an obligation should be classified as operating expenses and as to whether such expenses should be paid by obligations running beyond a year. We therefore conclude that as to the Hudson Valley securities, so-called, the application of the relator company should have been granted."

This opinion was written in construction of section 55 of the original Public Service Commissions Law (chapter 429, Laws of 1907). It will be seen that therein the court lays no stress whatever upon the question of the actual value of the property acquired by the notes which it was proposed to refund by the issue of bonds, but it does interpret the statute as conferring upon the commission the right and duty of determining whether the debts sought to be refunded are actual, and suggests that it has the further power of passing on whether the obligations are chargeable to capital or operating accounts.

In People ex rel. Binghampton Light, Heat & Power Co. v. Stevens, 203 N. Y. 7, 96 N. E. 114, the petitioner sought the approval of the commission to the issue of $1,000,000 of 5 per cent. bonds to be dated April 1, 1909, with the right to issue forthwith: (1) $500,000 of said bonds to acquire an equal amount of its bonds then outstanding, and which had been so outstanding prior to July 1, 1907; (2) $180,000 additional of said bonds to discharge promissory notes amounting to $158,000, which upon the hearing were shown to be for construction purposes, but were in whole or in part a mere renewal of old and obsolete plant. The commission in its opinion said:

"A mere denial of this part of the application does not fully meet the situation. The notes in question are lawful obligations and must be paid. The case should be continued for the purpose of ascertaining by full and detailed proof the sum at which the old plant is now carried in fixed capital. As above stated, the exact amount the commission has been unable to ascertain. When such amount is ascertained, then various courses are open."

After conferences, an order was finally made wherein it was recited that the petitioner was understood to have assented to a reduction of its capital stock to the amount of $100,000, so far as it could do so without a meeting of its stockholders, whereupon the commission authorized the issue of bonds to extent of $197,500 to be disposed of at not less than 80 per cent. of the par value, and the proceeds used for the sole purpose of defraying the $185,000 represented by the company's notes, and imposed as a condition that the petitioner should consent to a reduction of its capital stock to the sum of $100,000, and withheld its consent to the issue of the new bonds until the company had filed with the commission its written acceptance of the condition. The application for rehearing having been denied, the relator filed its petition for a writ of certiorari, asking for a review of the orders of the commission. In the opinion written by Judge Chase, the court quoted with approval from the dissenting opinion of Mr. Justice Kellogg in the Appellate Division (143 App. Div. 801, 128 N. Y. Supp. 448), wherein he said:

"The commission has no power to thus barter away the public interest, or on its own terms to permit the issue of securities which the law prohibits. Its discretion cannot override the discretion of the officers of the company in the management of its affairs, or the provisions of the statute which prescribe the cases in which securities are permitted. Its duty in the premises is to determine whether the proposed issue is necessary for the proper purposes of the company, is authorized by law, and is to be used in a proper manner. If such are the facts, it cannot withhold its certificate; otherwise, it cannot grant it."

The court then quoted with approval its own decision in People ex rel. Delaware & Hudson Company v. Stevens, supra, to the effect that the commissioners were to be the guardians of the public by enabling them to prevent the issuance of stock and bonds for other than the statutory purposes. The court then proceeded to say:

"The language quoted was used in considering the action of the board of directors of the relator in that case in the purchase of the stock of another corporation and of certain real property.

"There was not in that case before the commission or the court for consideration the question as to whether an outstanding indebtedness for which stocks and bonds were sought to be issued was incurred in purchasing property for or in making betterments and enlargements of the plant of the relator, or for renewals and replacements of the plant or any part of it as it had theretofore existed. The court in that case, in referring to the intent of the Legislature, said that by its enactment the commissioners should have supervision over the issuing of long-time bonds to the extent of determining whether they were issued under and in conformity with the provisions of the statute for the purposes mentioned therein, or whether they were issued for the discharge of the actual and not the fictitious debts of the company, or whether they were issued for the refunding of its actual obligations and not for the inflation of its stocks or bonds; and continuing the court further say: 'Beyond this it appears to us that the power of the commissioners does not extend, unless it may pertain to the power to determine whether an obligation should be classified as operating expenses and as to whether such expenses should be paid by obligations running beyond a year.' 197 N. Y. 13, 90 N. E. 64. The question as to whether the commission has authority to classify the expenditures of a corporation and ascertain what part thereof should be charged to capital account and what part to operating expenses was thus expressly reserved for further consideration.

"The amendment of the statute in 1910 gives to the commission authority to authorize the issue of stock, bonds, notes, or other evidences of indebtedness of a corporation payable at periods of more than 12 months after the date thereof for the discharge or lawful refunding of its obligations or for the reimbursement of moneys actually expended from income or from any other moneys in the treasury of the corporation not secured or obtained from the issue of stocks, bonds, or other evidence of indebtedness of such corporation within five years next prior to the filing of the application; but it expressly excepts from such authority of the commission the right to authorize the issue of such stocks, bonds, or other evidence of indebtedness for maintenance of service and for replacements. It also provides that the applicant for such permission must have kept accounts and vouchers in such manner as to enable the commission to ascertain the amount of money so expended and for the purposes for which the expenditure was made. The question as to what expenditures are a proper basis for permanent capitalization is an important one, always a proper and necessary subject for consideration, not alone by the directors of the corporation, but by any commission that has authority to grant or withhold its consent to the issue of new stock or bonds which are to become a part of the corporation's permanent capitalization.

"Wholly apart from the claim of the commission that this case must be determined upon the statute as it now exists, and assuming for the purpose of what we are here saying that the relator is right in claiming that this appeal must be determined upon the statute as it existed on the day when the original petition herein was filed, we are nevertheless of the opinion that it was the duty of the commission to determine whether the stock and bonds proposed by the relator were to secure money to pay floating indebtedness incurred in the ordinary running expenses of the corporation. Such determination by the commission would not be substituting the judgment of the commission for the judgment of the directors of the company in the management of its affairs, at least if the directors of the company had wholly and intentionally ignored the self-evident proposition that except for special and extraordinary circumstances some part of the expenses of renewing machines and plant originally charged to capital account must be paid as a part of the operating expenses of the corporation from year to year. We refer to the necessity of a a corporation providing for some part of the expenses of renewing machinery and plant from year to year as self-evident, because it has been so considered and expressed by the courts in many cases. People ex rel. Jamaica Water Supply Co. v. Tax Com'rs, 196 N. Y. 39, 57, 58 [89 N. E. 581]; Id., 128 App. Div. 13, 17, 18 [112 N. Y. Supp. 392]; People ex rel. Third Avenue R. Co. v. Tax Com'rs, 136 App. Div. 155, 159 [120 N. Y. Supp. 528], affirmed, 198 N. Y. 608 [92 N. E. 1098]; City of Knoxville v. Knoxville Water Co., 212 U. S. 1 [29 Sup. Ct. 148, 53 L. Ed. 371]. It is said by the relator that the Public Service Commissions Law as it existed in 1909 did not make any distinction between expenditures for operating purposes and expenditures for permanent improvements, but provided generally for the issue of stocks, bonds, notes, or other evidence of indebtedness payable at periods of more than 12 months after the date thereof 'when necessary for *the acquisition of property,* the construction, completion, extension or improvement of its plant or distributing system, or for the improvement or maintenance of its service *or for the discharge or lawful refunding of its obligations.*'

"Omitting from that part of the statute just quoted the words in italics, it would then clearly refer to the permanent improvement of the plant or distributing system, and not to mere renewals or replacements. The words in italics, although of broader meaning than those not in italics, should be construed in connection with them, and in view of one of the paramount purposes of the Legislature in establishing the commissions, which was to protect and enforce the rights of the public. The contention of the relator would enable any corporation to pay for labor, fuel, and other supplies constituting the most ordinary of all operating expenses by obligations extending less than 12 months, and then apply from time to time to the commission for authority to issue stocks or bonds for the payment of such obligations and insist upon the same as a matter of right without limit.

"It will not be denied that fuel and such other materials as are consumed from day to day and the labor incurred in daily maintenance should be paid for from the earnings of the corporation as a part of its running expenses prior to the payment of interest upon bonds or dividends upon capital stock. A reasonable consideration of the interests of the corporation and the ultimate good of its stock and bondholders, and a regard for the investing public and that fair-dealing which should be observed in all business transactions, require that machines and tools paid for and charged to capital account, but which necessarily become obsolete or wholly worn out within a period of years after the same are purchased or installed, should be renewed or replaced by setting aside from time to time an adequate amount in the nature of a sinking fund, or that by some other system of financing the corporation put upon the purchaser from the corporation the expense not alone of the daily maintenance of the plant but a just proportion of the expense of renewing and replacing that part of the plant which, although not daily consumed, must necessarily be practically consumed within a given time. If that is not done and renewals and replacements are continually added to the capital account, the capital account must necessarily become more and more out of proportion to the real value of the property of the corporation."

While therefore, as an original proposition, I might be inclined to hold that the commission had no power to do more than determine whether the original securities were validly issued, and that the aggregate of the refunding issues did not exceed them in amount, it is very clear from this last pronouncement in the Binghampton Case, which extends, amplifies, and makes more definite the decision in the Delaware & Hudson Case, that the commissioners are charged with a fuller and further duty. It is there laid down, as settled policy of the state, and as the interpretation to be given to both the original and amended statutes, that the commissioners, in their duty of protecting the public, can and must determine, before they give their consent to the issue of refunding securities, that the purposes for which the original securities were to be issued were strictly capital purposes, and not expense or operating purposes, and this, it will be seen, has been carried so far that the court has required the company to provide otherwise than by bonds for the expenses attending the ordinary renewal of its plant. The language used in the Binghampton Case is so broad that it applies to every application for refunding, no matter when the original securities were issued. The fact that the effect of such a refusal to a refunding plan in a single case may be disastrous, as it is very apt to prove in the present one, is not the controlling consideration, but rather that, under the settled policy of the law as now determined by the Legislature and interpreted by the courts, the approval of the commission to the issue of new securities, whether it be for refunding or other purposes, is notice to the public that the securities so authorized by it represent at least investments made by the company for capital account and not disbursements for mere temporary purposes.

While therefore the commission was wrong in applying the test of the actual value of the company's property and its earning capacity as a criterion for its approval of the issue of these new securities, it was right in refusing to approve their issue until the relator had proven that the securities sought to be refunded represented actual investments for the company's capital account. Nor was the determination

of the federal courts that certain of these amounts represented investments for capital account by the company binding upon the commissioners. They were not parties to the actions in the federal courts, and the discretion with which they are vested under the statute is not necessarily to be controlled by their outcome. They are to be satisfied of the fact that the old obligations represent investments in capital account of the petitioner by proof produced before them, and of the quality and value of that proof they are the judges. Nor does the fact that these obligations were incurred, in large part, before the Public Service Commission law went into effect, determine the question, for the essential feature of the situation is the approval of the Public Service Commission now sought to be obtained for the refunding bonds, and the representation thereby made to the public as an accompaniment of such approval that they represent actual investments in the company's capital account.

Therefore it seems to be quite immaterial how long ago the original securities were issued where the approval of the commission is sought to a refunding issue and proof of such investments must still be given as a basis for the action of the commission. While the net result of this may be to interfere with and perhaps destroy the plan by which it has been sought to save this corporation from reorganization, that consideration cannot stand in the way of the settled policy of the law. The relators have consistently taken the position that they were not required to make any proof of the disposition made of the funds realized from the original obligations, and therefore declined to make any effort to show that they represented capital investments. There is no presumption that any of the obligations represent such investments. In the absence of such proof or presumption, the commissioners were justified in denying the application. Nor did the relators bring themselves within the exception clause, nor present any facts requiring the commission to exercise its discretion thereunder.

I therefore reach the conclusion that in a refunding case the inquiry of the commission is properly directed to the following considerations, the evidence requisite to reach a determination whereupon should be furnished by the petitioner: (1) Whether the proposed issue is reasonably required for the refunding purpose. (2) Whether the expenditure to be refunded is a capital, as distinct from an operating or income, charge. (3) If the expenditure to be refunded is an operating or income charge, whether such refunding should nevertheless be permitted under the exception clause of the statute, which reads, "Except as otherwise permitted in the order in the case of bonds."

The writ of certiorari must therefore be dismissed, and the proceedings of the commission be affirmed, with costs. Settle order on notice.

CLARKE and HOTCHKISS, JJ., concur.

SCOTT, J. (dissenting). The facts in this case have been so carefully and thoroughly stated by Mr. Justice DOWLING that I shall not attempt to restate them, contenting myself with a brief expression of my views upon the questions involved. I entirely agree with Mr.

Justice DOWLING that the question of the value of the property of the relator company was irrelevant to the question before the Public Service Commission.  With the other conclusions reached by him I am unable to agree.  The whole matter resolves itself, as I see it, into the question whether or not the obligations sought to be refunded are such as the company is entitled to refund under the Public Service Commissions Law.  It is not questioned that the obligations are valid and represent bona fide indebtedness of the relator company.  By far the greater portion of this indebtedness was incurred and the obligations issued long before the passage of the Public Service Commissions Law, and at a time when it was perfectly lawful, although perhaps unwise, for such a corporation as the relator to issue time obligations to meet current expenses, and to issue stock or scrip representing the enhancement of the value of its property, although such enhancement was not in the form of money.  None of these old obligations therefore, some dating back to 1884, were tainted with illegality at their inception or at the time of the passage of the Public Service Commissions Law.

That act took effect on July 1, 1907 (chapter 429, Laws 1907), and imposed restrictions, theretofore unknown, upon the powers of corporations within its purview to issue long-time securities.  Section 55 of the act, as it now stands (chapter 480, Laws 1910), is the provision of law by which the relators claim to be entitled to issue bonds must be tested.  It is quoted at length in the opinion of Mr. Justice DOWLING. It provides that certain corporations, including street railroad corporations, may issue bonds or other evidence of indebtedness payable more than 12 months after the date thereof for certain specified purposes to wit:  (1) for the acquisition of property;  (2) the construction, completion, extension, or improvement of its facilities;  (3) for the improvement or maintenance of its service;  (4) for the discharge or lawful refunding of its obligations;  (5) for the reimbursement of moneys actually expended from income within five years prior to the filing of an application with the proper commission for the required authorization, for any of the aforesaid purposes except maintenance of service and except replacements.

The purpose for which the relator company seeks authority to issue long-time bonds is one of the purposes for which it is specifically provided that such bonds may be issued, to wit, "for the discharge or lawful refunding of its obligations."  The debts sought to be refunded being concededly lawful outstanding obligations, it would seem that the language of the act expressly permits their refunding.  That some part of these obligations may in the past, prior to July 1, 1907, have been issued for purposes for which long-time bonds may not now be issued, seems to me to be beside the question.  I see nothing in the Public Service Commissions Law indicating that it was intended to operate retroactively so as to place under the ban of its disapproval valid obligations issued before the passage of the act, and lawful when issued.  The act was intended to introduce a new system of financing public service corporations, and to forbid, in the future, the issue of long-time securities for purposes which ought, in the opinion of the Legislature, to be met and paid out of current income.  All the provi-

sions of the act forbidding the issue of long-time securities for purposes properly chargeable to operating expenses or to income look to the future, not to the past. From this point of view the language of the Court of Appeals in People ex rel. Delaware & Hudson Company v. Stevens et al., 197 N. Y. 1, 90 N. E. 60, is significant. The court was speaking of an application for the refunding of notes issued for a purpose lawful when they were issued, but unlawful when the refunding application was made. It said:

"It was therefore evidently the legislative intent in the enactment of this provision that the commissioners should have supervision over the issuing of long-time bonds to the extent of determining whether they were issued under and in conformity with the provisions of the statute for the purposes mentioned therein, or whether they were issued for the discharge of the actual and not the fictitious debts of the company, or whether they were issued for the refunding * * * and not for the inflation of the stocks or bonds. Beyond this it appears to us that the power of the commissioners does not extend, unless it may pertain to the power to determine whether an obligation should be classified as operating expenses and as to whether such expenses should be paid by obligations running beyond a year"—for even as to operating expenses the commission has power in its discretion to permit the issue of long-time bonds.

I am not unmindful of the late decisions of the Court of Appeals in People ex rel. Binghampton Light, Heat & Power Co. v. Stevens et al., 203 N. Y. 7, 96 N. E. 114, from which my Brother DOWLING has so copiously quoted. The opinion in that case must, of course, be read with reference to the particular circumstances upon which it was based. The court had before it an order permitting the refunding of both long-time and short-time obligations; some of the latter, if not all, having apparently been incurred after the passage of the Public Service Commissions Law. The commission had attached to its order, as a condition, the requirement that the relator company should reduce its capital stock. What the court decided was that this condition was improper, not that the consent should not have been given as to any part of the obligations sought to be refunded; for it remitted the application to the commissioners for further consideration. In the course of the opinion the learned judge who spoke for the court dwelt strongly upon the impropriety, under the terms of the act, of allowing the issue of long-time bonds to meet operating and replacement expenses. His remarks were applicable, as is the act which he was engaged in expounding, to securities issued after the act became a law; but there is no single word in the opinion which can be fairly construed as indicating that obligations lawfully incurred before the passage of the act, for whatever purposes, might not be refunded.

If the obligations which the relator company seeks to refund are, as I consider that they are, those which by the express terms of the statute the said relator is authorized to refund by long-time obligations, the defendants were bound to give their assent to the issue. All that the commission is authorized to do in such a case is to inquire whether the obligations sought to be refunded belong to one of the classes enumerated in the section cited, as in my opinion these securities clearly do, and that the amount of the refunding issue is not excessive for such purpose. As to the latter point there can be no question in this

case, because it is proposed to surrender and refund capital securities amounting to $3,168,513.60, upon which there has accrued interest exceeding $1,000,000, by the issue of new bonds of the par value of $2,760,000.

For these reasons, and without elaborating them at greater length, I am of opinion that the order of the Public Service Commission should be reversed, and the case remanded, with instructions that the application be granted.

INGRAHAM, P. J., concurs.